

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

UNITED STATES OF AMERICA,

    v.

                      **CRIMINAL NO. 2:12cr184**

**ROBERT PATRICK HOFFMAN, II,**

    **Defendant.**

### OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR LESSER-INCLUDED OFFENSE INSTRUCTIONS

This matter comes before the Court upon Robert Patrick Hoffman, II's ("Defendant") oral motion for issuance of two lesser-included offense instructions. This opinion is written to set forth in writing the reasons for orally denying the instructions when offered. For the reasons set forth herein, the Court **DENIES** Defendant's Motion for Lesser-Included Offense Instructions.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was charged in a one-count Superseding Indictment with Attempted Espionage, in violation of Title 18, United States Code, Section 794(a). ECF No. 50. Defendant's five-day trial on that one-count Superseding Indictment began on Thursday, August 15, 2013. On Wednesday, August 21, 2013, after approximately one-hour and twenty-minutes of deliberation, the jury returned a verdict of guilty.

The evidence presented at trial showed that Defendant had served in the United States Navy for approximately 20 years, having achieved the rank of Petty Officer First Class. During his 20 years of service, Defendant principally served aboard U.S. submarines as a Cryptologic Technician (Technical) ("CTT"). Defendant retired from active duty on or about October 21, 2011.

As a CTT, Defendant held a TOP SECRET/SENSITIVE COMPARTMENTALIZED INFORMATION ("SCI") security clearance, which amongst other things permitted Defendant to access information concerning CONTROLLED ACCESS PROGRAMS ("CAPS"). As a result, Defendant had access to classified information relating to the programs and operations in which he participated.

In the course of being granted his security clearance, Defendant entered into Classified Information Nondisclosure Agreements with the United States on or about: (1) January 16, 1992; (2) December 11, 2001; and (3) September 7, 2009. Gov.'s Trial Exs. 1-3. On May 27, 1992, Defendant also entered into a Sensitive Compartmentalized Information Nondisclosure Agreement with the United States. Gov.'s Trial Ex. 4. In entering into these agreements, Defendant agreed that he would never divulge classified or SCI information to anyone unless he: (1) "officially verified that the recipient ha[d] been properly authorized by the United States Government to receive it"; or (2) obtained prior, written notice of authorization from the Department or Agency responsible for the classified or SCI information at issue. These Agreements further advised Defendant that any unauthorized disclosure of classified or SCI information "may constitute violations of United States criminal laws," including Title 18, United States Code, Section 794. See Gov.'s Trial Exs. 1-4.

On or about July 13, 2011, on the eve of his retirement from the U.S. Navy, Defendant signed a Security Termination Statement. Gov.'s Trial Ex. 5. In executing that Statement, Defendant agreed the he would not thereafter "communicate or transmit classified information to any person or agency," Gov.'s Trial Ex. 5, ¶ 3, and would "report to the Federal Bureau of Investigation or to the local Naval Criminal Investigative Service office without delay any incident wherein an attempt is made by an unauthorized person to solicit classified information."

2

Gov.'s Trial Ex. 5, ¶ 4. The Security Termination Statement further advised that United States criminal laws, including Title 18, United States Code, Section 794, "prescribe severe penalties for unlawfully divulging information affecting National Defense." Gov.'s Trial Ex. 5, ¶ 5.

After executing his Security Termination Statement, Defendant entered into a stage of service deemed "terminal leave." Trial testimony explained that this is the final period of leave taken by U.S. service members prior to separating or retiring from the military. Persons on terminal leave have not retired, and are still considered to be on active duty. In August 2011, while on terminal leave, Defendant traveled overseas for approximately three weeks. During that time, Defendant visited a former Soviet-bloc country which the U.S. military has deemed a "high" risk to U.S. service members based on security considerations such as counterintelligence, safety, and criminal threats.

In June 2012, the Federal Bureau of Investigation (FBI) began to investigate whether Defendant had passed, or was willing to pass, classified information to foreign intelligence operatives. The first stage of the FBI's investigation involved answering a personal ad posted by Defendant on the Internet. The FBI initially communicated with Defendant in a series of email exchanges using the pseudonym "Megan Feeney." See Gov.'s Trial Exs. 6-8. As those conversations progressed, a female undercover agent was brought into the investigation in order to interact personally with Defendant. That agent, who testified at trial under the pseudonym "Tracy Tea," went on two dinner dates with Defendant. The second dinner date occurred on or about August 10, 2012, and was subject to audio recording by the FBI. Portions of that audio recording were played at trial. See Gov.'s Trial Ex. 12A (CD of August 12, 2012 dinner date audio recording; Gov.'s Trial Ex. 12B (transcript of clips from August 12, 2012 dinner date audio recording). During the course of their dinner date, Defendant disclosed that, during his trip

3

to the former Soviet-bloc country in August 2011, he had personally met and delivered a gift to the President of that country.

On or about September 21, 2012, the Federal Bureau of Investigation (FBI) undertook a "false-flag operation" with respect to Defendant. Supervisory Special Agent Stephen Laycock, of the FBI's Counterintelligence Engines Program, explained that a false-flag operation is an undercover operation where an intelligence service assumes the identity of a foreign intelligence service. In Defendant's case, the FBI assumed the identity of the Russian Federation's intelligence service in order to determine whether Defendant had been cooperating, or was willing to cooperate, with foreign intelligence operatives.

On or about September 21, 2012, a second female undercover agent approached Defendant's home in Virginia Beach, VA. That undercover agent, who testified at trial under the pseudonym of "Olga Doe," approached Defendant's home at approximately 8:20 A.M. Eastern Standard Time. The Agent's approach to the home, and interaction with Defendant, was subject to video and audio recording by the FBI. The video recording of that interaction was played at trial. See Gov.'s Trial Ex. 15A (videotape of September 21, 2012 package delivery to Defendant by FBI); Gov.'s Trial Ex. 15B (transcript of September 21, 2012 package delivery to Defendant by FBI).

After Ms. Doe rang the doorbell multiple times, Defendant opened the door. The undercover Agent announced that she was looking for "Robert," and after Defendant affirmed his identity, the Agent stated that she was there to deliver something to him on behalf of a "friend" in Moscow, Russia. The undercover FBI Agent handed Defendant the package and stated "just read it, umm . . . follow the directions, and I might be seeing you again." Gov.'s Trial Ex. 15B, at 3. The interaction concluded at approximately 8:29 A.M.

4

Defendant's name and address appeared in Russian on the envelope delivered by the undercover FBI Agent on September 21, 2012. Gov.'s Trial Ex. 16.

Defendant's name and address appeared in Russian on the exterior of the package delivered by the undercover FBI Agent on September 21, 2012. Within the package was a letter and medal. The letter, written in broken-English, represented that "comrades" in "special service" of the former Soviet-bloc country Defendant had visited in August 2011 had recommended contacting him, as it was believed his "technical expertise" could prove useful in solving a "special problem." The letter expressed a willingness to pass Defendant "generous compensation in exchange for special help and information." The letter directed Defendant to send an email to a specified address on or before September 28, 2012, with the subject to read "Hello from Hawaii." Trial testimony explained that persons trained in counterintelligence matters, as Defendant had been, would recognize that subject line to be a "parole"—a code word or phrase used by a recipient of a message to confirm the sender's identity. The letter further requested that, in his reply, Defendant confirm the date he met "our friends" in the former Soviet-bloc country "for positive identification." The letter assured Defendant that "security will be highest priority," and directed him to discuss the letter's contents with no one, and destroy the letter once it was read and understood. Gov.'s Trial Ex. 17. Accompanying the letter was a medal—a copy of the Soviet Order of the Red Banner. Gov.'s Trial Ex. 18. An "operations log" maintained by Defendant throughout his interaction with what he believed to be foreign intelligence operatives evidences that he had identified a number, "308," engraved on the back of the medal and believed it would serve as "the Rosetta stone for decrypting future correspondence."

Later that same day, at approximately 3:46 P.M. Eastern Standard Time, Defendant

responded to the specified email address with the subject line reading "Hello from Hawaii." As requested, Defendant stated in his response that he had traveled overseas from August 3-24, 2011. Defendant concluded the email by stating: "I look forward to renewing our friendship." Gov.'s Trial Ex. 19.

Utilizing the pseudonym "Alexei Vorovnin," FBI Agents responded to Defendant's email on September 23, 2012 at approximately 1:26 P.M. Eastern Standard Time. The sender represented that he could be referred to as "Vladimir," and that he was a representative of the Russian security services based in Washington, DC. Vladimir stated that "[f]urther instructions and tradecraft will come soon once provided by our directorate in Moscow." Until then, Vladimir requested that Defendant answer a number of questions, including: (1) "[d]o you still have access to military information"; (2) "[w]hat classified compartments can you access"; (3) "[a]re you able to photograph [military] installations?"; and "[w]hat are your specific requests in exchange for aiding us?" Vladimir concluded the email by explaining that Defendant's reply should use the subject "Sun is shining," and usage of the phrase "[a] rainy day" would signal danger. Gov.'s Trial Ex. 20.

That same day, at approximately 4:00 P.M. Eastern Standard Time, Defendant sent a response to Vladimir's email with the subject line of "Sun is shining." Gov.'s Trial Ex. 21. In that email, Defendant advised that in order to answer all of the questions posed they would need to develop a physical means of transmitting information. Defendant further explained that Vladimir's question concerning compensation could not be definitively answered, as it would depend on factors "such as type of aid required, risk, time required, and number of people involved." Gov.'s Trial Ex. 21.

On Wednesday, September 26, 2012 at approximately 12:11 P.M. Eastern Standard

Time, Vladimir sent Defendant another email with an encrypted document attached thereto. The email represented that Vladimir was sending Defendant a "secret recipe," and to open it he would need to "add the number on the back of our gift to [Defendant's] year of birth minus six." Gov.'s Trial Ex. 22, at 1. The encrypted attachment was a three-page document which contained specific instructions on how Defendant should go about communicating with the Russian intelligence service from that point forward. The attachment advised that Defendant should no longer utilize the email address he had been communicating with, unless there was a problem, in which case he should issue a warning to the Russian intelligence service by sending an email containing the phrase "The power is out." The attachment further suggested that Defendant physically pass information to the Russian intelligence service via "dead-drops" at First Landing State Park in Virginia Beach, VA. Two locations were designated within the email where Defendant could make the drops, and it was suggested that he place information in a green or black trash bag sealed with tape. After making each drop, Defendant was directed to place a "trigger"—a one-inch piece of white electrical tape—on a sign located at the west-side of the Park's parking lot. Defendant was to place the trigger there each time he made a drop, thereby conveying to the Russians that a package was ready for pick-up, whereas the Russians would leave a piece of yellow tape in the same spot when a package was available for Defendant to retrieve. The email further posed a series of 13 questions, numbered (a) through (m), which requested information concerning: (1) Defendant's access to classified information; (2) U.S. military operations and plans as they pertain to the Russian Federation; (3) U.S. Navy operations and plans throughout the world; and (4) Defendant's specific requests in exchange for any information he might provide. Gov.'s Trial Ex. 22, at 2-4. If the operation outlined in the encrypted attachment was acceptable to Defendant, he was to reply with an email on or before

7

September 30, 2012 which contained the words "This weekend I will visit my brother."

On September 26, 2012, Defendant responded with an email which stated "[t]his weekend I will visit my brother." Gov.'s Trial Ex. 23. On September 30, 2013, Defendant visited a Hope Depot in Virginia Beach, VA, where he purchased 33-gallon garbage bags and electrical tape. Gov.'s Trial Ex. 24. By that time, the Government had set-up video surveillance of dead-drop sites at First Landing State Park designated in the encrypted attachment. On September 30, 2012, the FBI recorded Defendant make the first of a series of dead-drops at the designated location and placing the "trigger"—white electrical tape—on the specified sign. Gov.'s Trial Exs. 25-26 (video recordings of Defendant's first dead-drop); see also Gov.'s Trial Exs. 29-30 (photographs of black garbage bag left by Defendant after first dead-drop); Gov.'s Trial Exs. 31-32 (photographs of "trigger" left by Defendant on sign after first dead-drop). After Defendant departed the area, FBI Agents retrieved from the designated dead-drop site a black garbage bag containing a USB-flash drive and notecard within a sandwich baggie. The notecard provided directions on how to bypass the USB-flash drive's encryption. Gov.'s Trial Exs. 33-34.

After retrieving the contents of the black garbage bag, the FBI attempted to open the files contained on the USB-flash drive utilizing Defendant's instructions. That effort initially proved unsuccessful and, on Monday, October 1, 2012 at approximately 6:15 P.M. Eastern Standard Time, another email was sent from "Vladimir" representing that the Russian intelligence service's efforts to access the information had proven unsuccessful. Gov.'s Trial Ex. 35. In a series of email exchanges, Defendant explained that he would make a second drop of the information the following week, Gov.'s Trial Ex. 36, and provided Vladimir with a Microsoft Word document setting forth specific instructions on how to bypass the USB-flash drive's encryption. Gov.'s Trial Ex. 38.

The Government once again set-up video surveillance of the dead-drop site at First Landing State Park designated in the encrypted attachment. On October 4, 2012, the FBI recorded Defendant make a second dead-drop at the designated location. Gov.'s Trial Ex. 39 (video recordings of Defendant's second dead-drop); see also Gov.'s Trial Exs. 41-43 (photographs of black garbage bag left by Defendant after second dead-drop). Defendant also placed the "trigger"—white electrical tape—on the specified sign. Gov.'s Trial Exs. 45-46 (photographs of "trigger" left by Defendant on sign after second dead-drop). Once again, the black garbage bag left by Defendant contained a USB-flash drive and note within a plastic sandwich bag. Gov.'s Trial Exs. 47-48. The FBI was able to successfully access the documents contained on that USB-flash drive. The first document contained a password hint. Gov.'s Trial Ex. 48A. The second document set forth parameters for passwords that Defendant would use in future dead-drops, and requested that Vladimir modify the "parole" used to indicate a new dead-drop—"This weekend I will visit my brother"—as Defendant does not have a brother, and he believed further usage would arouse suspicion. Gov.'s Trial Ex. 48B. Finally, the third document contained Defendant's answers to the series of 13 questions posed by Vladimir in the encrypted attachment transmitted to Defendant on Wednesday, September 26, 2012. Gov.'s Trial Ex. 48C. A copy of Defendant's answers, with all classified information contained therein redacted, was introduced into evidence at trial. Gov.'s Trial Ex. 48C. Amongst other things, Defendant represented that he would be "happy to aid the Russian navy," Gov.'s Trial Ex. 48C, at 3, and explaining that the "price of information varies depending on the information[] and what is involved to get said information." For instance, Defendant explained that "[t]asks that involve taking a life" would "require significant compensation, either monetary or via favors." Gov.'s Trial Ex. 48C, at 3.

On October 11, 2012, Vladimir and Defendant had another email exchange indicating that Defendant was to pick-up a package from the Russian intelligence service from the dead-drop site on October 14, 2012. Gov.'s Trial Exs. 49-50. At the dead-drop site, the FBI left another USB-flash drive, Gov.'s Trial Exs. 51-52, which contained a document posing a series of 21 questions, numbered (a) through (u), asking for a variety of information concerning Defendant's background and U.S. intelligence and military operations. Gov.'s Trial Ex. 53. The Government again set-up video surveillance at the dead-drop site, and captured Defendant retrieving the package they had left from that location. Gov.'s Trial Ex. 54.

On October 21, 2012, the FBI recorded Defendant making a third dead-drop at the designated location in First Landing State Park. Gov.'s Trial Ex. 55 (video recordings of Defendant's third dead-drop); see also Gov.'s Trial Exs. 58-60 (photographs of black garbage bag left by Defendant after third dead-drop). Defendant also placed the "trigger"—white electrical tape—on the specified sign. Gov.'s Trial Exs. 60-61 (photographs of "trigger" left by Defendant on sign after third dead-drop).

The FBI recovered a 10-page, encrypted Word document from the USB-flash drive that Defendant left at the third dead-drop. Gov.'s Trial Ex. 63. Selected portions of Defendant's response to Question-L and Question-M are set forth in Government's Trial Exhibit 64. At trial, Captain Frank Cattani, a 27-year veteran of the U.S. Navy currently assigned as Commander of Submarine Force Atlantic and Director for Tactics and Training, testified that he had reviewed the original, unredacted copies of Defendant's answers to Vladimir's second set of questions. Gov.'s Trial Ex. 63. The Captain testified that, in his answers to both Question-L and Question-M, Defendant disclosed information classified as SECRET. The Captain further testified that, in his answer to Question-M, Defendant transmitted information classified as TOP

SECRET/SCI.

At the conclusion of Defendant's response to Question-U, Defendant told Vladimir that "[i]f you are the agency you claim to be or are, or associated with the person I think you may be, then . . . . [a]ttach a photo to your next package to me of both sides of the gift" that he had transmitted to the President of the former Soviet-bloc country he visited in August 2011, as well as "the exact name [Defendant] gave when [Defendant] delivered it to the gentleman that talked with me. Defendant stated that he would "allow for only one delay," and if Vladimir "cannot provide the image, chances are that" their relationship would end. Gov.'s Trial Ex. 63, at 10.

The suspicion reflected in Defendant's answer to Question-U is consistent with the statements set forth in his so-called "Operation's Log." Gov.'s Trial Ex. 67. On October 2, 2012, Defendant expressed concern that either Vladimir was incompetent or "this whole thing could be a setup against me." Defendant stated that, if Vladimir continued being obvious in his email communique, he would need to break contact until another handler could be arranged. Concerned that such emails had raised red flags with the U.S. intelligence community, Defendant raised the possibility of preemptively contacting either the FBI or CIA concerning his activities. Gov.'s Trial Ex. 67, at 4. By October 10, 2012, Defendant had begun "outlining the plan to slowly bring the FBI into the fold." Gov.'s Trial Ex. 67, at 5. One day later, on October 11, 2012, Defendant again expressed dissatisfaction with the overt nature of Vladimir's email communications. On October 14, 2012, Defendant expressed further concern about whether he was actually working with agents from the Russian Federation, suggesting that their line of questioning "leads me to believe they are just collecting the information to sell to a third party or are not actually part of the RSS." Gov.'s Trial Ex. 67, at 6.

By October 31, 2012, Defendant approached the FBI concerning his interactions with

what he believed to be Russian intelligence operatives. Defendant was interviewed by FBI Special Agent James Dougherty at that time. During the course of his interview, Defendant explained that he had been contacted by the Russian Federation on September 21, 2012, and had been transmitting information to them via dead-drops since that time. Gov.'s Trial Ex. 66B, at 16-17. Defendant acknowledged during his interview that, in answering Vladimir's second set of questions, he had provided the Russian Federation with classified information. Gov.'s Trial Ex. 66B, at 24, 27. The Defendant further explained that, if the Russian Federation followed the recommendations set forth in his answers, "it would help them." Gov.'s Trial Ex. 66B, at 29.

On November 5, 2012, Vladimir contacted Defendant by email and expressed concern that he had not visited his brother that past weekend. Gov.'s Trial Ex. 68. On November 8, 2012, Defendant had a telephone conversation with FBI Special Agent Dougherty concerning Vladimir's most recent email communication. Special Agent Dougherty directed Defendant to "respond to that communication . . . very short and to the point and[,] you know[,] what you would normally respond if you were going to uh . . . to go out there." Gov.'s Trial Ex. 69B, at 1 (transcript of phone conversation); see also Gov.'s Trial Ex. 69A (audio recording of phone conversation). Agent Dougherty emphasized a second time, before concluding the call, that Defendant's response was to be "short, sweet, to the point[,] like you normally would." Gov.'s Trial Ex. 69B, at 1.

On November 8, 2012, Defendant responded to Vladimir's email. The subject line of that email read "The power is out." Gov.'s Trial Ex. 70. This was the "parole" that Vladimir had directed Defendant to use in order to covertly indicate to Russian agents that a problem had arisen. See Gov.'s Trial Ex. 22, at 2 (directing Defendant to send email with subject of "The power is out" if a problem arises). Defendant stated that he would not be able to make another

dead-drop until November 18, 2012.

On December 5, 2012, the Government secured a warrant to search Defendant's residence in Virginia Beach, VA. Gov.'s Trial Ex. 73. The FBI executed that search warrant on December 6, 2012. Within the home the FBI found paperwork from Defendant's SCI debriefing. Gov.'s Trial Ex. 77. In signing that debriefing paperwork, Defendant had acknowledged his "continuing obligation to protect SCI material" and that such obligation "is binding for life." Gov.'s Trial Ex. 77, at 1. The Government also found within Defendant's home the Soviet Order of the Red Banner medal that Olga Doe had delivered to Defendant on September 21, 2012, as well as Defendant's passport and visa application evidencing his travel to a former Soviet-bloc country in August 2011. See Gov.'s Trial Ex. 84A (Defendant's passport); Gov.'s Trial Ex. 84B (Defendant's visa application to former Soviet-bloc country).

The Government also secured a warrant to search Defendant's vehicle, a 2004 Mercury Mountaineer, on December 5, 2012. Gov.'s Trial Ex. 85. Within Defendant's vehicle the Government found three passes for First Landing State Park dated: (1) October 4, 2012; (2) November 17, 2012; and (3) November 18, 2012. Gov.'s Trial Exs. 87-88 (photographs of park passes within Defendant's vehicle); Gov.'s Trial Ex. 89 (photographs of three park passes for First Landing State Park found within Defendant's vehicle). Defendant also had two additional parking stubs for Virginia State Parks. Gov.'s Trial Ex. 90. Finally, the Government found a roll of white electrical tape in the pocket of Defendant's driver-side door, Gov.'s Trial Ex. 91, and a box of black trash bags, Gov.'s Trial Exs. 92-93.

That same day, Defendant was taken into custody and signed an FBI Advice of Rights Form and Consent, thereby having been advised and acknowledged understanding of his Miranda rights. Defendant was then once again interviewed by FBI Special Agent James

13

Dougherty, with the interview subject to audio recording. A variety of clips from that December 6, 2012 interview were played during the course of trial. Gov.'s Trial Exs. 72A-72B.

## II. DEFENDANT'S MOTIONS FOR LESSER INCLUDED OFFENSE INSTRUCTIONS ARE DENIED

On August 20, 2013, after resting his case, Defendant moved for two lesser-included offense instructions under (1) 18 U.S.C. § 793(d) and (2) 18 U.S.C. § 798(a)(3). See Min. Entry, Aug. 20, 2013, ECF No. 116 (proposed instructions 24A and 24B); see also Def.'s Proposed J. Instructions, ECF No. 103. The Government objected to Defendant's proposed lesser-included offense instructions. After presenting argument on the proposed instructions, Defendant's counsel sought additional time to identify authority supportive of Defendant's position. The Court granted that request, withheld ruling on Defendant's proposed lesser-included offense instructions, and recessed the matter for the day.

The Court reconvened on August 21, 2013. Defendant presented additional argument concerning his proposed lesser-included offense instructions. The Government persisted in its objections to those instructions. After hearing additional argument from both sides on the issue, the Court denied Defendant's proposed lesser-included offense instructions. Defendant was then convicted of Attempted Espionage, in violation of 18 U.S.C. § 794(a).

### A. STANDARD OF REVIEW

Rule 31(c) of the Federal Rules of Criminal Procedure provides that "[a] defendant may be found guilty of any of the following: (1) an offense necessarily included in the offense charged; (2) an attempt to commit the offense charged; or (3) an attempt to commit an offense necessarily included in the offense charged, if the attempt is an offense in its own right." Fed. R. Crim. P. 31(c)(1)-(3).

The Supreme Court explained in Schmuck v. United States that a Court's determination

14

of whether a defendant is entitled to a lesser offense instruction is to be guided by the "elements test." 486 U.S. 705, 716 (1989). Under the "elements test," a court engages in "a textual comparison of criminal statutes," and disregards "inferences that may be drawn from evidence introduced at trial." Id. at 720-21. For the purposes of the "elements test," "[o]ne offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense. Where the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c)." Schmuck, 486 U.S. at 716. The elements test, therefore, requires the Court to compare the statutes against one another and to do so in a vacuum sealed off from the trial.

In Schmuck, the Supreme Court affirmed a district court's rejection of a lesser-included offense instruction using the elements test. Id. The case is instructive. The defendant in Schmuck was a used-car distributor indicted on 12 counts of mail fraud. Id. at 707. The defendant would purchase used cars, roll back the odometers, and then sell the automobiles to local retailers. Unaware of the defendant's fraud, the retailers would then sell the automobiles for artificially-inflated prices based on the fraudulent mileage readings. Id.

The Schmuck defendant moved, pursuant to Rule 31(c) of the Federal Rules of Criminal Procedure, for a jury instruction on the misdemeanor offense of tampering with an odometer. Id. at 707-08 n.3. The district court denied the motion, finding that the defendant "was not entitled to the lesser offense instruction because odometer tampering was not a necessarily included offense of mail fraud." Id. at 708 n.3. The Supreme Court affirmed, finding that "the elements of the offense of odometer tampering are not a subset of the elements of the crime of mail fraud." Id. at 721 (citing United States v. Schmuck, 840 F.2d 384, 386 (7th Cir. 1988), aff'd, 489 U.S. at 705)). The mail fraud statute required the government to prove that the Schmuck defendant:

(1) devised or intended to devise a scheme to defraud (or to perform specified fraudulent acts) and (2) used the mail to execute, or attempt to execute, the scheme (or specified fraudulent acts). However, "[t]he offense of odometer tampering includes the element of knowingly and willfully causing an odometer to be altered." Because that element "is not a subset of any element of mail fraud," the Court found that the offense of odometer tampering is not "necessarily included" in the offense of mail fraud. Id. at 721-22; see also Fed. R. Crim. P. 31(c)(1) (authorizing a lesser-included offense instruction for "an offense necessarily included in the offense charged" (emphasis added)).

**B.    DISCUSSION**

**1.    TITLE 18, UNITED STATES CODE, SECTIONS 794(A) AND 793(D)**

Defendant first moves the Court for a lesser-included offense instruction to Title 18, United States Code, Section 794(a) and offers Title 18, United State Code, Section 793(d) as that lesser-included offense. The Court compares the statutes. Section 794(a) provides, in pertinent part, that:

1. Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation . . .

2. attempts to communicate, deliver, or transmit, to any foreign government . . . or to any representative, officer, [or] agent . . . thereof, either directly or indirectly,

3. any document, writing, . . . plan, . . . note, . . . or information relating to the national defense . . .

shall be guilty of an offense against the United States. 18 U.S.C. § 794(a). On the other hand, Section 793(d) provides, in pertinent part, that:

1. Whoever, lawfully having possession of . . . or being entrusted with any . . . information relating to the national defense

2. which information the possessor has reason to believe could be used to

16

the injury of the United States or to the advantage of any foreign nation . . .

3. attempts to communicate, deliver, transmit . . . the same

4. to any person not entitled to receive it . . .

shall be guilty of an offense against the United States. 18 U.S.C. § 793(d). As this comparison demonstrates, the first element of § 793(d), "[w]hoever, lawfully having possession of . . . or being entrusted with any . . . information relating to the national defense," is not present in § 794(a). Indeed, § 794(a) may reach thieves and spies who unlawfully obtain information while § 793(d) punishes only those individuals trusted with national security information and lawfully in possession of it. It does not make any difference in § 794(a) how the accused received the information. Moreover, § 794(a) requires that the would-be spy attempt to communicate with a foreign government, representative, officer, or agent thereof, 18 U.S.C. § 794(a), while § 793(d) punishes attempts made to communicate information to "any person not entitled to receive it." 18 U.S.C. § 793(d). A putative spy may provide information to an individual working for a foreign government who is entitled to that information, such as an ally's intelligence officer, and thus fall under § 794(a) but outside of § 793(d). Thus § 793(d) covers a narrower set of individuals attempting to commit the crime proscribed therein than § 794(a) as well as a different set of individuals proscribed from receiving the information.

Put another way, to prove Attempted Espionage under § 794(a), the Government must, beyond a reasonable doubt, establish: (1) that a defendant attempted to communicate, deliver, or transmit a document, writing, plan, note, or information to a foreign government or agent thereof; (2) that such information related to the national defense of the United States; and (3) that the defendant acted with intent, or reason to believe, that such information was to be used to the injury of the United States or to the advantage of a foreign nation. 18 U.S.C. § 794(a); see also

17

Trial Tr., Aug. 21, 2012, at 69 (Court's instructions to the jury concerning the essential elements of § 794(a)). The offense set forth at § 793(d) requires the Government to further prove that a defendant lawfully possessed, or was entrusted with, information relating to the national defense[1] and that he attempted to communicate that information to someone "not entitled to receive it." See 18 U.S.C. § 793(d) (applying to persons "lawfully having possession of . . . or being entrusted with any . . . information relating to the national defense and attempting to communicate information relating to the national defense to "any person not entitled to receive it"). These prongs are extra elements, and Defendant is not entitled to a lesser-included offense instruction on § 793(d) because that offense's elements are not a subset of those set forth in § 794(a). Schmuck, 489 U.S. at 721-22.

Therefore, the Court **FINDS** that § 793(d) contains elements that are not a subset of the elements set forth in § 794(a) and **DENIES** Defendant's Motion for a lesser-included offense based on the offense set forth in § 793(d).

### 2. TITLE 18, UNITED STATES CODE, SECTIONS 794(A) AND 798(A)(3)

Defendant next moves the Court for a lesser-included offense instruction pursuant to Title 18, Unites State Code, Section 798(a)(3). Section 798(a)(3) provides, in pertinent part, that:

> Whoever knowingly and willfully communicates, furnishes, transmits, or otherwise makes available to an unauthorized person, or publishes, or uses in any manner prejudicial to the safety or interest of the United States or for the benefit of any foreign government to the detriment of the United States any classified information . . . concerning the communication intelligence activities of the

---

[1] Evidence presented a trial showed that Defendant had, in the course of his service with the U.S. Navy, been entrusted with the classified information he sought to unlawfully transmit. However, as noted earlier, the fact that evidence exists which might satisfy an additional element does not entitle Defendant to the instruction under § 793(d). The Supreme Court explained as much in Schmuck, having held that a Court's determination of whether a defendant is entitled to a lesser offense instruction is to be guided by the "elements test." Schmuck, 486 U.S. at 716. Under the "elements test," a court engages in "a textual comparison of criminal statutes," and disregards "inferences that may be drawn from evidence introduced at trial." Id. at 720-21. Thus, although Defendant might have been "entrusted with. . . information relating to the national defense," 18 U.S.C. § 793(d), that fact is irrelevant to the Court's inquiry under Schmuck's elements test.

18

United States or any foreign government . . .

shall be guilty of an offense against the United States. 18 U.S.C. § 798(a)(3). The Court **FINDS**

that Defendant is not entitled to such instruction because § 798(a)(3): (1) sets forth elements that

are not "necessarily included" in § 794(a); and (2) does not provide that an attempt is an offense

in its own right.

First, Defendant is not entitled to an instruction on § 798(a)(3) because that offense's

elements are not a subset of those set forth in § 794(a). For example, under § 794(a), the

Government must prove that the information relates to the national defense. 18 U.S.C. § 794(a)

(applying to "information relating to the national defense"). Section 798(a)(3), on the other hand,

requires    the    Government    to    prove    that    the    defendant    transmitted    "classified

information . . . concerning the communication intelligence activities of the United States or any

foreign government." That subsection further defines "communication intelligence" as "all

procedures and methods used in the interception of communications and the obtaining of

information from such communications by other than the intended recipients." 18 U.S.C.

§ 798(b).

Insofar as § 798(a)(3) requires transmittal of classified information, such information

may also fall within the scope of § 794(a). <u>See</u> Exec. Order No. 13,526, §§ 1.2(a)(1)-(3), 75

Fed.Reg. 707, 707-08 (Jan. 5, 2010) (defining classification levels by reference to degree of

harm "to the national security" reasonably expected to result from unauthorized disclosure).

However, the reverse does not hold true, as commonsense dictates that not all information

"relating to the national defense," 18 U.S.C. § 794(a), would satisfy the definition of

"communication intelligence." 18 U.S.C. § 798(a)(3). Thus "communication intelligence" is a

distinct element which must be proven beyond a reasonable doubt for a § 798(a)(3) offense, but

not for a § 794(a) offense. The Court therefore **FINDS** that the "communication intelligence"

19

element of § 798(a)(3) is not a subset of the elements set forth in § 794(a) and **DENIES** Defendant's Motion for a lesser-included offense based on the offense set forth in § 798(a)(3).

Second, Defendant is not entitled to an instruction on § 798(a)(3) because that subsection does not provide that an attempt is an offense in its own right. Pursuant to Rule 31(c)(3) of the Federal Rules of Criminal Procedure, a defendant may be found guilty of "an attempt to commit an offense necessarily included in the offense charged," but only "if the attempt is an offense in its own right." Fed. R. Crim. P. 31(c)(3). That principle is consistent with the fact that there is "no general federal statute proscribing attempt," and therefore "an attempt to commit criminal conduct 'is . . . actionable only where . . . a specific criminal statute makes impermissible its attempted as well as actual violation." United States v. Douglas, 525 F.3d 225, 251 (2d Cir. 2008) (quoting United States v. Marin, 513 F.2d 974, 976 (2d Cir. 1975), cert. denied, 555 U.S. 1033 (emphasis in original)).

On August 8, 2013, Defendant filed Proposed Jury Instructions which sought, among other things, a lesser offense instruction pursuant to § 798(a)(3). The first element set forth in Defendant's proposed instruction would require the Government to prove that "Defendant knowingly and willfully attempted to communicate, furnish, transmit or otherwise make available to an unauthorized person" classified information concerning communication intelligence." Def.'s Proposed Jury Instructions, ECF No. 103. However, § 798(a) only criminalizes an actual violation, and makes no mention of attempt liability.

The Court **FINDS** that, because an attempt is not "an offense in its own right" under § 798(a)," Fed. R. Crim. P. 31(c)(3), Defendant is not entitled to the lesser instruction sought in his Proposed Jury Instructions. ECF No. 103. The Court, therefore, **DENIES** Defendant's Motion for a lesser-included offense based on the offense set forth in § 798(a)(3).

## III.   CONCLUSION

For the reasons set forth herein, the Court: (1) **DENIES** Defendant's Motion for a lesser offense instruction under § 793(d); and (2) **DENIES** Defendant's Motion for a lesser offense instruction under § 798(a)(3). The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
February 5, 2014

21